

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-6-1999

# Caruso v. Blockbuster Sony

Precedential or Non-Precedential:

Docket 97-5693,97-5764

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Caruso v. Blockbuster Sony" (1999). *1999 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 6, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-5693 and 97-5764

WILLIAM CARUSO;
ADVOCATES FOR DISABLED AMERICANS;

PARALYZED VETERANS OF AMERICA,
Appellant,

v.

BLOCKBUSTER-SONY MUSIC ENTERTAINMENT CENTRE
AT THE WATERFRONT; BLOCKBUSTER CORPORATION;
SONY MUSIC ENTERTAINMENT, Division of Sony
Corporation of America

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. No. 95-cv-03400)
(District Judge: Honorable Joseph E. Irenas)

Argued: August 4, 1998

Before: NYGAARD, ALITO, RENDELL, Circuit Judges

(Opinion Filed: April 6, 1999)

NIKI KUCKES
DAVID S. COHEN (ARGUED)
JODY MANIER KRIS
Miller, Cassidy, Larroca & Lewin
2555 M Street, N.W.
Washington, D.C. 20037

ANTHONY J. BRADY, JR.
  (ARGUED)
1 Alpha Avenue, Suite 36
Voorhees, N.J. 08043

Counsel for Appellants

NORMAN E. GREENSPAN
  (ARGUED)
Blank, Rome, Comisky & McCauley
One Logan Square
Philadelphia, PA 19103

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

The Blockbuster-Sony Music Entertainment Centre
("E-Centre") is a music and entertainment facility located in
Camden, New Jersey. An interior pavilion at the E-Centre
provides fixed seating for 6,200 patrons, and an uncovered
lawn area located behind the pavilion can accommodate
approximately 18,000 spectators who either stand or sit on
portable chairs or blankets.

Appellant William Caruso, a Vietnam veteran who uses a
wheelchair as a result of his disability, attended a concert
at the E-Centre on July 13, 1995. The following day,
Caruso and the Advocates for Disabled Americansfiled a
complaint in federal district court alleging, inter alia, that
the E-Center does not comply with Title III of the Americans
with Disabilities Act (ADA), Pub.L. No. 101-336, 104 Stat.
327 (1990) (codified at 42 U.S.C. S 12181 et seq. (1994)),
because: 1) the wheelchair areas in the pavilion do not
provide wheelchair users with lines of sight over standing
spectators and 2) the lawn area is not wheelchair
accessible. The District Court granted summary judgment
in favor of the defendants on both claims.1 We now affirm
in part and reverse in part.

_____

1. Before entering final judgment, the District Court granted a motion by
the Paralyzed Veterans of America (PVA) to intervene as plaintiff solely
for the purpose of appealing the District Court's ruling that the E-Centre
does not need to provide wheelchair users sitting in the pavilion with
lines of sight over standing spectators.

2

I.

Title III of the ADA protects individuals against discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. S 12182 (a). Title III requires that newly constructed facilities be "readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable." 42 U.S.C. S 12183. In order to carry out these provisions, Congress has directed the Department of Justice (DOJ) to "issue regulations . . . that include standards applicable to facilities" covered by Title III. 42 U.S.C. 12186(b). Congress has further required that any standards included by the DOJ in its regulations "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board" ("Access Board"). 42 U.S.C. S 12186(c).[2]

Pursuant to its statutory authority under Title III, the DOJ has issued numerous regulations, see 28 C.F.R. SS 36.101–36.608 (1998), one of which adopts the Access Board's guidelines as the DOJ's own Standards for New Construction and Alterations ("Standards"). See 28 CFR S 36.406 (referring to 28 C.F.R. S 36, App. A). Both of the issues in this case require us to interpret portions of the DOJ Standards.

A. Lines of Sight

Appellants contend that DOJ Standard 4.33.3, which was adopted after notice and comment, requires wheelchair

_____

2. The Access Board is a federal agency that was created by the Rehabilitation Act of 1973. See 29 U.S.C. S 792(a). The Board is composed of 25 members: 13 public members appointed by the President, as well as officials of 12 federal agencies or departments. Id. The Board's mission focuses on the elimination of architectural, transportation, communication, and attitudinal barriers confronting people with disabilities. See 29 U.S.C. S 792(b). The ADA directed the Access Board to issue "minimum guidelines" to supplement the Board's existing Minimum Guidelines and Requirements for Accessible Design. 42 U.S.C. S 12204)(a).

seats in the E-Center pavilion to afford sightlines over standing spectators. Standard 4.33.3 provides:

> Placement of Wheelchair Locations. Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. . . .

28 C.F.R. S 36, App. A, 4.33.3.

Appellants first argue that the plain meaning of the phrase "lines of sight comparable to those for members of the general public" requires that "if standing spectators can see the stage even when other patrons stand, wheelchair users, too, must be able to see the stage when other patrons stand." PVA Br. at 23. While this argument has considerable force, it does not account for the rest of the language in Standard 4.33.3, which helps the reader to place the phrase "lines of sight comparable" in context. Standard 4.33.3 is entitled "Placement of Wheelchair Locations" and includes at least two provisions concerning the dispersal of wheelchair locations in facilities with fixed seating plans.[3] In addition, one of these dispersal provisions appears in the same sentence that contains the "lines of sight" requirement. Given this focus on the dispersal of wheelchair locations, it seems plausible to read the "lines of sight comparable" requirement as follows: if a facility's seating plan provides members of the general public with different lines of sight to the field or stage (e.g., lines of sight at a baseball game from behind the plate, on either side of the diamond, and from the outfield bleachers), it

_____

3. Appellants concede that the provisions in 4.33.3 requiring a "choice of admission prices" and "more than one location" when "the seating capacity exceeds 300" concern dispersal of wheelchair areas throughout a facility. See PVA Reply Br. at 7.

4

must also provide wheelchair users with a comparable opportunity to view the field or stage from a variety of angles.[4]

Appellants reject this suggestion that the "lines of sight" provision might require dispersal rather than vertical enhancement, contending that such a reading would impermissibly render other portions of Standard 4.33.3 superfluous. They argue:

> Standard 4.33.3 . . . contains an explicit dispersal provision, wholly independent of the "comparable" line of sight provision. It requires, in pertinent part, that "[w]heelchair areas . . . shall be provided so as to provide persons with disabilities a choice of admission prices." For facilities, such as modern sports and entertainment venues, that offer tickets at a range of prices depending on seating location, dispersal of wheelchair locations is required by this provision. Moreover, a requirement for dispersal is also derived from the language in Standard 4.33.3 that "[w]hen the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location." Construing the phrase "lines of sight comparable to those provided to members of the general public" as simply requiring dispersal of wheelchair locations, as the E-Centre urges, is contrary to the plain language of that regulation and would deprive important parts of the regulation of any meaning.

PVA Reply Br. at 6-7. This attempt to divorce the "lines of sight" requirement from the two provisions in 4.33.3 that are indisputably about dispersion overlooks the possibility that the three provisions are designed to work together so that: 1) at a minimum, facilities with over 300 seats provide at least two wheelchair locations and 2) larger facilities provide wheelchair users with the option of choosing from among seats that afford a variety of views for a variety of

_____

4. Although not discussed by the E-Centre, there might be an additional, distinct reason for concluding that the language of Standard 4.33.3 does not clearly require sightlines over standing patrons: In light of the fact that Standard 4.33.3 concerns the design of "seating plans" and "seating areas," it seems entirely possible that the drafters were assuming seated spectators and not addressing the issue of standing patrons.

corresponding prices. Contrary to appellants' assertion, this second result is not accomplished by the "choice of admission prices" language alone. For, if Standard 4.33.3 is read in piecemeal fashion as appellants suggest, a facility, regardless of its size and the number of views that it offers to the general public, would be able to place all wheelchair users in just two locations so long at it offers some choice of prices in those locations. See Independent Living Resources v. Oregon Arena Corp., 982 F. Supp. 698, 743 n.61 (D. Or. 1997).

In the end, it seems that both interpretations of the "lines of sight" language are plausible and would provide some benefit to wheelchair users. Appellants' reading would benefit wheelchair users by allowing them to see when other patrons stand. The E-Centre's reading would benefit wheelchair users by providing them with a greater opportunity to view a performance or event from a variety of viewpoints. Since both readings of the rule are plausible and are consistent with the ADA's purpose of enabling people with disabilities to share equally in the benefits provided by a public accommodation, we conclude that the "lines of sight" language is ambiguous.

Appellants' second contention is that, even if Standard 4.33.3 is ambiguous, the court should follow the interpretation that has been given to the rule by the DOJ. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (explaining that an agency's interpretation of its own regulation "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (internal quotations omitted); Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113, 123 (3d Cir. 1998) (DOJ Technical Assistance Manual entitled to deference). But see id. at 525 (Thomas, J., dissenting) ("giving substantive effect to . . . a hopelessly vague regulation . . . disserves the very purpose behind the delegation of lawmaking power to administrative agencies"); John F. Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1997)(urging reexamination of the principle of judicial deference to agency interpretations of regulations). Specifically, appellants rely on the following statement

6

appearing in a 1994 Supplement to the DOJ's Technical
Assistance Manual (hereinafter "1994 TAM Supplement"):

> In addition to requiring companion seating and
> dispersion of wheelchair locations, [Standard 4.33.3]
> requires that wheelchair locations provide people with
> disabilities lines of sight comparable to those for
> members of the general public. Thus, in assembly
> areas where spectators can be expected to stand during
> the event or show being viewed, the wheelchair
> locations must provide lines of sight over spectators who
> stand. This can be accomplished in many ways,
> including placing wheelchair locations at the front of a
> seating section, or by providing sufficient additional
> elevation for wheelchair locations placed at the rear of
> seating sections to allow those spectators to see over
> the spectators who stand in front of them.

1994 DOJ TAM Supp. P III-7.5180, Conditional App. at 49
(emphasis added).

In response, appellees maintain that the 1994 TAM
Supplement is not an interpretive rule entitled to deference,
but rather, an invalid attempt to adopt a new substantive
requirement without notice and comment. The E-Centre
bases this argument on the history of Standard 4.33.3,
which, according to the E-Centre, reveals that the rule was
not intended to address the issue of lines of sight over
standing patrons.

Standard 4.33.3 was originally proposed by the Access
Board on January 22, 1991. At that time, the provision
provided:

> Placement of Wheelchair Locations. Wheelchair
> areas shall be an integral part of any fixed seating plan
> and shall be dispersed throughout the seating area.
> They shall . . . be located to provide lines of sight
> comparable to those for all viewing areas.

56 Fed. Reg. 2380. In its public notice regarding the
proposed rule, the Access Board explicitly invited comments
on the issue of sightlines over standing spectators:

> Section 4.33.3 provides that seating locations for
> people who use wheelchairs shall be dispersed

7

throughout the seating area and shall be located to provide lines of sight comparable to those for all viewing areas. This requirement appears to be adequate for theaters and concert halls, but may not suffice in sports arenas or race tracks where the audience frequently stands throughout a large portion of the game or event. In alterations of existing sports arenas, accessible spaces are frequently provided at the lower part of a seating tier projecting out above a lower seating tier or are built out over existing seats at the top of a tier providing a great differential in height. These solutions can work in newly constructed sports arenas as well, if sight lines relative to standing patrons are considered at the time of the initial design. The Board seeks comments on whether full lines of sight over standing spectators in sports arenas and other similar assembly areas should be required.

56 Fed. Reg. 2314 (emphasis added).

On February 22, 1991, the DOJ published a notice in which it proposed to adopt the Access Board's Proposed Guidelines "with any amendments made by the [Access Board] during the rulemaking process." 56 Fed. Reg. 7478–79. The DOJ notice stated that "any comments" on the Access Board's Proposed Guidelines should be sent directly to the Board. Id. at 7479.

On July 26, 1991, the Access Board announced its proposed final guidelines. Along with the guidelines, the Board published commentary, including two passages relevant to the meaning of the "lines of sight comparable" language in 4.33.3. First, the Board gave the following response to comments on dispersal:

Response. The requirements in 4.33.3 for dispersal of wheelchair seating spaces have been modified. Wheelchair seating spaces must be an integral part of any fixed seating plan and be situated so as to provide wheelchair users a choice of admission prices and lines of sight comparable to those available to the rest of the public. . . .

56 Fed Reg. 35440. By discussing the "lines of sight" requirement in the section of the commentary concerning

8

dispersal, the Board appeared to be indicating that it was treating this requirement, like the choice of price requirement, as a dispersal requirement. The Board then went on to consider the issue of sightlines over standing patrons in a separate section of the commentary:

> Comment. The [Board] asked questions reg arding . . . lines of sight over standing spectators in sports arenas and other similar assembly areas. . . . Many commenters . . . recommended that lines of sight should be provided over standing spectators.

> Response. . . . The issue of lines of sight over standing spectators will be addressed in guidelines 5 for recreational facilities.

Id. (emphasis added).

On the same day that the Access Board issued its proposed guidelines, including the above comment and response seemingly deferring the issue of standing lines of sight, the DOJ promulgated Standard 4.33.3, which is worded identically to the Access Board's final proposed text, which addressed the sight-line issue. Unlike the Board, the Department did not initially express a view in its commentary on the issue of sightlines over standing spectators. Rather, in explaining its adoption of the Access Board's guidelines, the DOJ made the following general statement:

> The Department put the public on notice, through the proposed rule, of its intention to adopt the proposed [guidelines], with any changes made by the Board, as the accessibility standards. As a member of the Board and of its ADA Task Force, the Department participated actively in the public hearings held on the proposed guidelines and in preparation of both the

_____

5. It is important to note the difference between Access Board guidelines and DOJ guidelines. For the Access Board, guidelines are the substantive rules they develop and promulgate. Thus, in speaking of a future guideline, the Board was not referring to a future interpretation of 4.33.3, but rather, a separate substantive rule it would develop. By contrast, a DOJ guideline is an interpretation of a substantive rule, not the substantive rule itself.

proposed and final versions of [the guidelines] . . . [All] comments on the Department's proposed rule . . . have been addressed adequately in the final [guidelines]. Largely in response to comments, the Board made numerous changes from its proposal.

28 C.F.R. S 36, App. B, at 632-33.

The next discussion of the sightlines issue came in a 1992 Notice of Proposed Rulemaking published by the Access Board. There the Board summarized what had occurred during the 1991 notice and comment period with regard to 4.33.3 and expressed its future intentions:

During the initial rulemaking, the Board requested information on lines of sight at seating locations for persons who use wheelchairs. . . . An overwhelming majority of responses favored including a provision requiring lines of sight over standing spectators in sports arenas and other similar assembly areas. A few commenters opposed such a provision because it would be either unenforceable, add significant cost or reduce seating capacity. . . . The Board intends to address the issue of lines of sight over standing spectators in the guidelines for recreational facilities which will be proposed at a future date.

Question 17: The Board is seeking comments on the design issues associated with providing integrated and dispersed accessible seating locations with a clear line of sight over standing spectators in arenas, stadiums or other sports facilities. Clearly, not all seats in sports facilities afford clear lines of sight over standing spectators. Tall persons, guard railings or otherfixed elements in the facility may block one's view of the playing field. However, since persons with disabilities have fewer choices of seating locations, should all the accessible seating locations be required to have lines of sight over standing spectators? Would such a requirement compromise the requirement for dispersed wheelchair seating by providing seating in fewer locations? If maximum dispersal of accessible seating locations is provided, what percentage of such locations can be provided with a clear line of sight over standing

10

spectators? The Board encourages commenters to provide cost information and examples (including drawings, pictures or slides) of sports facilities where the accessible seating locations are dispersed, integrated and provide clear lines of sight over standing spectators.

57 Fed. Reg. 60618 (emphasis added).

Based on this regulatory history, the E-Centre contends that Standard 4.33.3 was intended to leave unresolved the issue of lines of sight over standing spectators, and, as a result, the DOJ was not entitled to "interpret" Standard 4.33.3 in 1994 in a fashion that did resolve the issue of sightlines over standing spectators. Cf. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (courts need not defer to an agency's interpretation of its own regulation if an "alternative reading is compelled by . . . indications of the [agency's] intent at the time of the regulation's promulgation"). The E-Centre maintains that, if the DOJ wanted to impose a new requirement that wheelchair users be able to see over standing patrons, it had to engage in notice and comment, since such a requirement would constitute a new substantive rule. See 5 U.S.C. S 553 (b) & (c) (notice and comment procedure required for substantive rules but not interpretive rules); DIA Navigation Co. v. Pomeroy, 34 F.3d 1255, 1264 (3d Cir. 1994) (explaining that a rule is substantive if "the agency intends to create new law, rights or duties").

Appellants dispute the E-Centre's characterization of the 1994 DOJ statement as a "substantive" rule. They argue that, because the DOJ did not explicitly adopt the Access Board's commentary, the meaning of Standard 4.33.3 was not limited by that commentary when it was adopted, and thus the 1994 statement does not constitute a "change" in the requirements under 4.33.3. They also maintain that even if the Access Board's commentary can be attributed to the DOJ, the DOJ was entitled to change its interpretation of Standard 4.33.3 in 1994 without notice and comment.

With regard to the threshold question of whether the Access Board's commentary can be attributed to the DOJ, the appellants rely on the District of Columbia Circuit's

11

analysis in Paralyzed Veterans of America v. D.C. Arena
L.P., 117 F.3d 579 (D.C. Cir. 1997):

> If the Department, when it promulgated the regulation,
> had said what the Board said, or even clearly adopted
> what the Board said, it would be hard to conclude that
> the Department did not subsequently "amend" the
> regulation in violation of the APA. But Justice did not
> do so in its statement of basis and purpose. It never
> referred to the Board's concern, nor did it imply that its
> regulation did not address the problem of lines of sight
> over standing spectators. It may well be that it is a
> plausible inference that Justice, at the time,
> deliberately intended the regulation to mean the same
> thing as did the Board -- but it is not a necessary
> inference. . . . We admit the issue is not easy;
> appellants almost but do not quite establish that the
> Department significantly changed its interpretation of
> the regulation when it issued the 1994 technical
> manual.

Id. at 587.

The problem with this analysis is that it results in a
conclusion that the DOJ, while aware that its proposed rule
was ambiguous as to an issue of concern to many
commenters,6 both: 1) adopted the proposed rule without
offering any explanation as to how it resolved the disputed
issue; and 2) later resolved the dispute by way of
interpretation. This result would violate an important
principle discussed in the Paralyzed Veterans opinion:

> It is certainly not open to an agency to promulgate
> mush and then give it concrete form only through

_____

6. In its own commentary to Standard 4.33.3, the DOJ stated that it had
"thoroughly analyzed" all of the comments received by the Board
regarding its proposed guidelines. See 28 C.F.R. S 36, App. B, at 632.
The Access Board's commentary makes clear that, in response to its
statement that 4.33.3 "may not suffice" to provide lines of sight over
standing spectators, "many" comments were received, 56 Fed. Reg.
35440, with a majority favoring the inclusion of"a provision requiring
lines of sight over standing spectators," but a few opposing such a
provision "because it would be either unenforceable, add significant cost
or reduce seating capacity." 57 Fed. Reg. 60618.

12

> subsequent less formal "interpretations." That technique would circumvent section 553, the notice and comment procedures of the APA.

Id. at 584. While the Paralyzed Veterans court concluded that the DOJ's promulgation of 4.33.3 did not violate this principle, id. at 584–85,[7] we must respectfully disagree. If this principle is ever violated, it would seem to be when an agency knows it is promulgating a rule that is ambiguous on a substantive issue of concern to commenters, and later tries to resolve the issue through an interpretive rule.

Rather than concluding that the DOJ consciously chose to ignore a substantive issue regarding 4.33.3 that was raised in the Access Board's notice of proposed rulemaking and debated by commenters, we conclude that the DOJ implicitly adopted the Access Board's analysis of 4.33.3. This conclusion is strongly supported by the following factors: 1) the DOJ referred all comments to the Board; 2) the DOJ relied on the Board to make adequate changes based on those comments; 3) the Board specifically changed the language of 4.33.3 in response to comments and explained that change in its commentary; 4) the DOJ was a "member of the Board" and "participated actively . . . in preparation of both the proposed and final versions of the [guidelines]," 28 CFR Part 36, App. B, at 632; and 5) the DOJ's commentary stated that the final guidelines promulgated by the Board adequately addressed all comments. Accord Independent Living Resources v. Oregon Arena Corporation, 982 F. Supp. 698, 741 (D. Or. 1997).

If the Access Board's views on 4.33.3 are attributed to the DOJ, the remaining questions are: 1) whether these views are inconsistent with the 1994 DOJ TAM interpretation, and 2) whether such an inconsistency renders the 1994 DOJ TAM interpretation invalid. With regard to the first question, the Access Board's commentary

_____

7. The D.C. Circuit additionally relied on the fact that the defendants in that case did not press the argument that Standard 4.33.3 constituted "mush." Id. In the instant case, by contrast, the E-Centre has argued that the DOJ's rule would be impermissibly vague on the issue of sightlines if the Access Board's commentary were not attributed to the DOJ. See Appellees' Br. at 33.

13

treated the "lines of sight" language in 4.33.3 as a dispersal provision while expressly deferring the issue of views over standing patrons. See 56 Fed. Reg. 35440. Thus, as interpreted by the Board, the "lines of sight comparable" language requires dispersal of wheelchair seats but does not address elevation of wheelchair seats to allow wheelchair users to see over standing spectators. By contrast, the 1994 TAM Supplement interprets 4.33.3 as requiring lines of sight over spectators who stand. Thus, the DOJ's interpretation is inconsistent with the Access Board's interpretation in that it imposes a requirement that had not previously existed.

Turning to the issue of an agency's ability to reinterpret an ambiguous regulation, we agree with the District of Columbia Circuit's discussion of this question in Paralyzed Veterans. In that case, the court rejected the DOJ's argument that "an agency is completely free to change its interpretation of an ambiguous regulation so long as the regulation reasonably will bear the second interpretation." 117 F.3d at 586. The court explained:

> The government argues that an agency has the same latitude to modify its interpretation of a regulation as it does its interpretation of a statute under Chevron. We think the government is wrong. . . . Under the APA, agencies are obliged to engage in notice and comment before formulating regulations, which applies as well to "repeals" or "amendments." See 5 U.S.C. S 551(5). To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine those APA requirements. That is surely why the Supreme Court has noted (in dicta) that APA rulemaking is required where an interpretation "adopt[s] a new position inconsistent with . . . existing regulations." Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 100 (1995).

Paralyzed Veterans, 117 F.3d at 586 (emphasis added).8
_____

8. Notwithstanding this principle, the Paralyzed Veterans court did not invalidate the interpretation in the 1994 TAM Supplement because it ultimately concluded that the Access Board's interpretation of 4.33.3, while probably inconsistent with the DOJ 1994 Tam Supplement interpretation, was not attributable to the DOJ. 117 F.3d at 587.

14

See also Syncor Intern. Corp. v. Shalala, 127 F.3d 90, 94-95 (D.C. Cir. 1997) (dicta) (same).9

Appellants contend that this court should not follow the District of Columbia Circuit's view because it is contrary to Supreme Court and Third Circuit cases that allow agencies to change their interpretations of regulations. See PVA Br. at 38-43 & n.22. Most of the cases cited by the appellants, however, concern agency interpretations of statutes, not regulations.10 As for the cited cases that do discuss an agency's ability to change its mind about a regulation, they are readily distinguishable from the circumstances contemplated by the District of Columbia Circuit and present in the instant case. First, appellants rely on the Supreme Court's statement in a recent Medicare case that the Secretary of Health and Human Services was "not estopped from changing a view she believe[d] to have been grounded on a mistaken legal interpretation" of a regulation. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 517 (dicta).11 However, the inconsistency in Thomas

_____

9. The District Court in the instant case used similar reasoning to conclude that the interpretation in the 1994 TAM Supplement was invalid due to the lack of notice and comment:

> When the "legislative history" of an administrative regulation evinces
>> an intent not to cover a certain subject matter, the notice-and-comment requirements of the APA cannot be evaded merely by interpreting an existing regulation to cover subject matter consciously omitted from its scope.

968 F. Supp. 210, 216 (D.N.J. 1997).

10. See Smiley v. Citibank, 517 U.S. 735, 742 (1996); Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993); Rust v. Sullivan, 500 U.S. 173, 186 (1991); Sacred Heart Medical Center v. Sullivan, 958 F.2d 537, 544 (3d Cir. 1992).

11. This statement is dicta because the Court had already concluded earlier in its opinion that "petitioner fail[ed] to present persuasive evidence that the Secretary has interpreted the[regulation] in an inconsistent manner." Id. at 515.

15

Jefferson did not involve a "fundamental change" of a prior interpretation that had general applicability, but rather, an agency's adoption of a position that was arguably inconsistent with some past actions taken by the Secretary in individual cases. See id. at 517. Appellants also rely on our decision in C.K. v. New Jersey Dep't of Health and Human Services, 92 F.3d 171 (3d Cir. 1996), for the proposition that an agency head, "in her discretion, is allowed to change her mind over time regarding the wisdom of certain programs." Id. at 187. C.K., however, involved inconsistent waiver decisions by an agency head who had been given the statutory authority to waive certain requirements. Thus, like Thomas Jefferson, it did not address the situation where an agency publicly announces one interpretation of a regulation that will presumably be applied to all covered parties and then attempts to fundamentally change that interpretation. Finally, appellants rely on this court's decision in Beazer East, Inc. v. EPA, 963 F.2d 603 (3d Cir. 1992), for the proposition that "nothing in the APA prohibits an agency from adopting or revising an interpretation of a regulation that has been properly promulgated in an adjudication and applying that interpretation retroactively." Id. at 609. Beazer East is distinguishable from the instant case for two reasons. First, it involved agency adjudication, which is governed by different principles than rulemaking. See id. at 609. Second, while the Beazer East court did state that agencies could adopt or revise their substantive rules in adjudication, it made clear that it was not dealing with a situation where "the agency inconsistency interpreted a standard over time or changed its interpretation." Id. at 610. In fact, the court went on to explain that, if a new interpretation that is inconsistent with past interpretations "effectively imposes additional substantive requirements on the regulated community, it should be placed directly in the regulations. The regulations would then be subject to notice and comment, with appropriate participation by the regulated community." Id. at 611 n.7 (dicta). This statement is entirely consistent with the District of Columbia Circuit's conclusion that an agency cannot effect a "fundamental change in its interpretation of a substantive regulation without notice and comment. . . ." Paralyzed Veterans, 117 F.3d at 586.

16

Taken together, the cases indicate that agencies can alter the interpretation of their regulations in modest ways without requiring notice and comment. However, if an agency's new interpretation will result in significantly different rights and duties than existed under a prior interpretation, notice and comment is required. This distinction, which is not precise, is akin to the distinction that is generally made between substantive and interpretive rules. See DIA Navigation Co. v. Pomeroy, 34 F.3d 1255, 1264 (3d Cir. 1994) (although the line between substantive and interpretive rules is "incapable of being drawn with much analytical precision," and the tests formulated to draw the line "are often circular," the "basic determination . . . involves whether . . . the agency intends to create new law, rights or duties") (quotations omitted). In that context, we have indicated that it is "helpful to analyze a rule with an eye to the policies animating the APA's notice and comment requirement." Id. at 1265. "The essential purpose of according S 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." Id. (quotations omitted).

In the instant case, the public was invited to discuss a certain issue during a notice and comment period, and comments were submitted on both sides of the issue. The public was then told that the issue would not be resolved by the adopted rules. A year later, the public was told that a rule resolving the issue would be "proposed at a future date." 57 Fed. Reg. 60618. However, three years after the initial rules were adopted, the DOJ announced, without explanation and without engaging in notice and comment, that it would interpret the initial rules as resolving the issue that had previously been left open. Such behavior is unfair to those who relied on agency statements that the issue was not being resolved by the initial rules and interpreting the regulation as resolving the issue that it seemed plainly to have eschewed. Accordingly, we conclude that the DOJ's 1994 reinterpretation constituted a "fundamental change" in interpretation that could only be made by adopting a substantive rule pursuant to notice and comment. Since the DOJ has not followed the notice and comment procedures, we conclude that the E-Centre

17

did not violate the ADA by failing to provide wheelchair users with sightlines over standing patrons. If DOJ believes that the ADA should be interpreted to require that wheelchair users be given lines of sight equivalent to standing patrons -- and such a rule certainly has much to recommend it -- the DOJ can accomplish this end through notice-and-comment rulemaking. Indeed, the DOJ probably could have achieved this end already had it followed that course initially.

B. Access to the Lawn Area

Appellants' second contention is that the E-Centre does not comply with the ADA because there is no wheelchair access to the lawn area.12 In relevant part, Title III requires that the facilities of a public accommodation be"readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable." 42 U.S.C. S 12183(a)(i). To implement this mandate, the DOJ has adopted a regulation requiring that "[a]t least one accessible route . . . connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site." Standard 4.1.2(3) (emphasis added). Consistent with this provision, the appellants seek "at least one wheelchair lift to . . . provide access to the lawn area from the two outdoor plazas." J.A. at 90 (Paradigm Report). See also Appellants' Br. at 13 (arguing that "if a ramp were built to the lawn area there would be greater integration of the facility"). The E-Centre would appear obligated to provide such access unless it can demonstrate structural impracticability.

The DOJ has explained in its regulations that the structural impracticability exception is reserved for "those rare circumstances when the unique characteristics of

_____

12. Before the District Court, Caruso also argued that the E-Centre had to include the capacity of the lawn area (18,000) in its calculations of how many wheelchair locations to provide. The District Court rejected this argument on the ground that DOJ Standard 4.1.3(19), which requires that the number of wheelchair locations be equal to 1% + 1 of a facility's capacity, only applies to assembly areas with "fixed seating."
968 F. Supp. at 218. Caruso has not challenged this ruling on appeal.

18

terrain prevent the incorporation of accessibility features."
28 C.F.R. S 36.401(c). Additional guidance, some of which is
directly on point, can be found in the DOJ commentary
that was published with the regulations:

> Consistent with the legislative history of the ADA,
> this narrow exception will apply only in rare and
> unusual circumstances where unique characteristics of
> terrain make accessibility unusually difficult. . . .
> Almost all commenters supported this interpretation.
> Two commenters argued that the DOJ requirement is too
> limiting . . . . These commenters suggested consistency
> with HUD's Fair Housing Accessibility Guidelines, which
> generally would allow exceptions from accessibility
> requirements, or allow compliance with less stringent
> requirements, on sites with slopes exceeding 10%.

> The Department is aware of the provisions in HUD's
> guidelines . . . . The approach taken in these
> guidelines, which apply to different types of
> construction and implement different statutory
> requirements for new construction, does not bind this
> Department in regulating under the ADA. . . .

> The limited structural impracticability exception
> means that it is acceptable to deviate from accessibility
> requirements only where unique characteristics of
> terrain prevent the incorporation of accessibility
> features and where providing accessibility would
> destroy the physical integrity of a facility. A situation in
> which a building must be built on stilts because of its
> location in marshlands or over water is an example of
> one of the few situations in which the exception for
> structural impracticability would apply.

> This exception to accessibility requirements should not
> be applied to situations in which a facility is located in
> "hilly" terrain or on a plot of land upon which there are
> steep grades. In such circumstances, accessibility can
> be achieved without destroying the physical integrity of
> a structure, and is required in the construction of new
> facilities.

28 C.F.R. S 36, App. B., at 649 (emphasis added).

This passage indicates that public accommodations cannot demonstrate structural impracticability merely by providing evidence of a slope of over 10%. Yet, this is precisely how the E-Centre tries to show that "it is impossible to make the lawn area wheelchair accessible." Appellees' Br. at 48-49 (relying solely on the fact that the lawn area has a slope ranging from 12-15%). The E-Centre has presented no argument as to why it cannot provide a ramp or a lift that would enable wheelchair users to reach the lawn area.13 Moreover, Caruso has introduced affidavits from people who have visited other concert venues with sloping grass areas that are wheelchair accessible. J.A. 210-11.

Not surprisingly, the E-Centre does not focus on the "structural impracticability" issue, and instead presses two other arguments. First, it contends that it need not provide wheelchair access to the lawn area because the DOJ Standards only require wheelchair seating to be provided when there is fixed seating for the general public. See Appellees' Br. at 46-47; see DOJ Standard 4.1.3 (19). This argument, however, misconstrues the issue being appealed. Caruso is not asking that the E-Centre be required to construct wheelchair seating areas on the lawn that comply with the various requirements governing fixed seating plans.14 Rather, he is merely seeking an accessible route to the lawn area. Caruso is entitled to such a route under the

_____

13. The E-Centre incorrectly asserts that the Standards prohibit ramps to have a slope of more than 2%. The correct figure is 8.3%. Standard 4.8.2. In any event, this number is irrelevant. Caruso is not asking for a ramp that runs up the lawn area. Rather, he merely wants a ramp or lift that will provide him with access to the lawn area.

14. Thus, there is no basis for the E-Centre's fear that it will have to "flatten the lawn area, cover it in concrete, and divide it into seating rows
to make it wheelchair accessible." See Appellee's Br. at 49. In fact, it is
unlikely that such a requirement could ever be imposed under the ADA since Title III specifically provides that facilities can refrain from making
modifications that "would fundamentally alter the nature of such . . . facilities." 42 U.S.C. S 12182(b)(2)(A)(ii). In any event, Caruso has made it clear that he is not seeking access to the lawn areas so that he can sit in his wheelchair on a concrete slab. Rather, he desires access so that he can "enjoy a concert on [the] grass or a blanket" while picnicking with family and friends. Appellants' Br. at 13.

regulations regardless of whether or not the facility is also required to meet the more specific DOJ Standards concerning fixed seating plans. See 28 C.F.R. S 36.401(c)(2) ("[A]ny portion of the facility that can be made accessible shall be made accessible to the extent that is not structurally impracticable."); id., S 36, App. A, Standard 4.1.1(5)(a) (same); id. Standard 4.1.2(2) ("At least one accessible route . . . shall connect . . . accessible spaces that are on the same site."). Accordingly, we reject the argument that assembly areas without fixed seating need not provide access to people in wheelchairs.

The E-Centre's other justification for failing to provide access is based on the "Equivalent Facilitation" provision in the DOJ Standards. It states:

> Departures from particular technical and scoping requirements of this guideline by the use of other designs and technologies are permitted where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility.

DOJ Standard 2.2. The E-Centre contends that it has provided "equivalent facilitation" for wheelchair users by placing additional wheelchair locations in the interior pavilion. See Appellees' Br. at 47-50. The District Court agreed and granted summary judgment for the E-Centre on this basis.

The principal problem with the E-Centre's "equivalent facilitation" argument is that it treats the ADA's requirement of equal access for people with disabilities as a "particular technical and scoping requirement." This is simply not the case. Rather, equal access is an explicit requirement of both the statute itself and the general provisions of the DOJ's regulations. See 42 U.S.C. S 12183; 28 C.F.R. S 36.401. Properly read, the "Equivalent Facilitation" provision does not allow facilities to deny access under certain circumstances, but instead allows facilities to bypass the technical requirements laid out in the Standards when alternative designs will provide "equivalent or greater access to and usability of the facility." Therefore, we conclude that the E-Centre cannot rely on the

21

"Equivalent Facilitation" provision to excuse its failure to provide any wheelchair access to an assembly area that accommodates 18,000 people.

Furthermore, as noted by Caruso in his appellate brief, the language of Title III itself precludes a reading of the "Equivalent Facilitation" provision that would allow venues to restrict wheelchair access to certain areas based on a belief that wheelchair users will be better off elsewhere. See 42 U.S.C. S 12182 (b)(1)(A)(iii) (discriminatory to provide a separate benefit unless necessary to provide equal benefit); id. at (b)(1)(B) (benefits of a public accommodation must be provided in the most integrated setting appropriate to the needs of the individual). As the DOJ explains in its commentary:

> Taken together, [the statutory and regulatory provisions concerning separate benefits and integrated settings] are intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, public accommodations are required to make decisions based on facts applicable to individuals and not on the basis of presumptions as to what a class of individuals with disabilities can or cannot do. . . . Separate, special, or different programs that are designed to provide a benefit to persons with disabilities cannot be used to restrict the participation of persons with disabilities in general, integrated activities.

28 C.F.R. S 36, App. B., at 622.

The District Court, in concluding that the E-Centre had not violated Title III by failing to provide access to the lawn area, appeared to give precisely the type of justification that the DOJ commentary finds repugnant to the ADA:

> The E-Centre provides the disabled with higher quality (i.e. closer) seats in the pavilion for the same price as lawn seats. Plaintiffs do not offer any reasons why the interior seats are not equivalent or superior to lawn seating. In our view, the E-Centre provides equal, if not

22

greater, access to its facility for wheelchair users in the interior than it does for non-wheelchair users on the lawn.

968 F. Supp. at 218. On appeal, the E-Centre reiterates this argument that it is acceptable to restrict wheelchair users from the lawn area because they provide "higher quality (i.e. closer) seats in the pavilion." Appellees' Br. at 49. We reject this contention as inconsistent with the plain language of Title III. See 42 U.S.C.S 12182(b)(1)(c) ("Notwithstanding the existence of separate or different programs or activities . . . an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different."). We further conclude that the only way the E-Centre can justify its failure to provide access to the lawn area is by showing structural impracticability. Since the E-Centre has not yet made such a showing, we reverse the grant of summary judgment on Caruso's lawn-access claim and remand for further proceedings related to this claim.

II.

For the reasons explained above, we affirm the decision of the District Court in part, and we reverse in part, and we remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

23