Robert MILLER, Plaintiff,

v.

The CALIFORNIA SPEEDWAY CORPORATION, Defendant.

No. EDCV0100434SGL.

United States District Court, C.D. California.

Sept. 8, 2006.

---

1194

James Richard Boyd, Center For Disability Access, Mark D. Potter, Center For Disability Access, Russell C. Handy, Center For Disability Access, San Marcos, CA, for Robert Miller, Plaintiff.

Bryan R. Reid, Lewis Brisbois Bisgaard and Smith, Jennifer C. Hsu, Lewis Brisbois Bisgaard and Smith, San Bernardino, CA, Michael R. Young, Elliot Snyder & Reid, Redlands, Rima M Badawiya, Lewis Brisbois Bisgaard and Smith, San Bernardino, CA, for The California Speedway Corporation, Does 1 through 10 inclusive, Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LARSON, District Judge.

This matter is before the Court on the parties' cross-Motions for Summary Judgment (plaintiff's, filed on January 30, 2006, and defendant's, filed on January 31, 2006). The Court has read and considered the moving, opposition, and reply documents, as well as an evidentiary objection and the parties' evidence. The Court has also considered an Amicus Brief, filed by the United States Department of Justice on June 9, 2006, and defendant's Reply thereto. The matter was heard on August 28, 2006. Pursuant to the evidence presented and arguments offered by the parties, the Court issues the following order **DENYING** plaintiff's Motion for Summary Judgment and **GRANTING** defendant's Motion for Summary Judgment.

### I. Nature of the Case and Issue Presented

This action is brought pursuant to Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189, and arises out of the inability of a wheelchair-bound NASCAR race spectator to see over the heads and bodies of ambulatory spectators who stand during the exciting parts of NASCAR races. In addition to the ADA claim, plaintiff brings similar state-law claims.

The undisputed facts presented by this action require the Court to determine what deference, if any, should be given to the Department of Justice's ("the DOJ") interpretation of a provision of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"). See 28 C.F.R., Pt. 26, Appdx. A, § 4.33.3 (hereinafter "ADAAG" § 4.33.3). Specifically, this case addresses the deference to be given the DOJ's interpretation of ADAAG § 4.33.3, which reads: "Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." The DOJ has interpreted § 4.33.3 to mean that, "in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand." 1994 Supplement, DOJ *Technical Assistance Manual*, § III–7.5180 (hereinafter "1994 TAM Supplement").

In the end, the Court determines that, as a matter of law, it may *not* give deference to the DOJ's current position on § 4.33.3, as expressed in the 1994 TAM Supplement. Moreover, because the DOJ's 1994 interpretation imposing the

"lines of sight" requirement was adopted without the requisite notice-and-comment period mandated by the Administrative Procedure Act ("APA"), the interpretation, and thus the requirement, must be rejected in favor of the DOJ's original interpretation that failed to impose the "lines of sight" requirement.

## II. Objection to Evidence

 Defendant objects to plaintiff's expert's declaration in which the expert offers an opinion that defendant argues amounts to a conclusion of law. *See* Bishop Decl. ¶ 8 ("It is my expert opinion that the upper[-]level wheelchair seating area does not provide wheelchair patrons a line of sight over standing spectators."). Defendant's objection is overruled. Although Bishop uses the same phrase as the regulation, "line of sight," it is clear in context that Bishop is not making a conclusion of law; rather, Bishop merely offers the opinion that, based on his examination of the site, plaintiff, when using his wheelchair, would be unable to see the track over standing spectators. Therefore, the opinion addresses a matter of fact.

 By contrast, defendant's expert offers a conclusion of law. *See* Gibbens Decl. ¶ 7 ("In my on-site inspection of THE CALIFORNIA SPEEDWAY, as well as review of diagrams of the [S]peedway, I agree that the subject seating does in fact comply with the applicable provisions of the [Americans with Disabilities

Act Accessibility Guidelines] and the [California Building Code] and that plaintiff's allegations are without merit.... [P]laintiff's contention that he is entitled to an unobstructed line of sight over the heads of standing spectators is without merit.").

The Court will draw its own conclusions of law.

## III. Uncontroverted Facts

Defendant, the California Speedway Corporation ("the Speedway"), operates a racing track located in Fontana, California. The Speedway is a track and stadium facility that is open to and sells tickets to the public for events such as NASCAR racing. The Speedway was built after January, 1993.

Plaintiff Robert Miller is disabled and uses a wheelchair for mobility. Specifically, plaintiff became a quadriplegic after an injury severed his spinal cord at the C5/C6 vertebra level.

Each year since the Speedway opened in 1997, plaintiff has attended three to six of its NASCAR races.

The Speedway has wheelchair spaces located on the upper level of the Speedway. When plaintiff occupies these spaces in his wheelchair, he is unable to see over the ambulatory spectators in the rows in front of him when those spectators stand.[1] Not surprisingly, the ambulatory spectators tend to stand up to see the more exciting

---

1. Plaintiff offers his declaration and photographs taken by him as evidence on this point. Plaintiff also offers the declaration of his expert, who is of the opinion that, based on his examination of the site and an analysis that employed the use of industry standard "average anthropomorphic dimensions," plaintiff is unable to see the track over standing spectators. In response, defendant offers evidence, in the form of an expert declaration and photographs taken by its expert, purporting to controvert this fact. The Gibbens declaration establishes that the wheelchair spaces plaintiff occupied are located on an elevated platform behind seating for ambulatory spectators, as illustrated by the accompanying pictures. However, the pictures are of an empty stadium, without any standing spectators, and it is unclear whether the photographs were taken from the angle which a wheelchair-bound spectator would view the stadium and track. This evidence fails to dispute plaintiff's testimony and photographic evidence that, from his eye-level while seated in his wheelchair, he is unable to see over spectators standing in front of him.

parts of the race, making it impossible for plaintiff to see "the part of the race [he] wants to see the most." Miller Depo. at 27.

## IV. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. P. 56(c).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford,* 877 F.2d 728 (9th Cir.1989).

## V. Plaintiff's ADA Claim

### A. *ADA Title III*

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The ADA definition of "public accommodation" includes race tracks such as the Speedway. *See* 42 U.S.C. § 12181(7)(c) (" 'Public accommodation' [includes] a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment ...."). Title III requires that facilities constructed for first occupancy on or after January 26, 1993, be "readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable." 42 U.S.C. § 12183; 28 C.F.R. § 36.401(a)(1).

To implement these provisions, Congress directed the Department of Justice to "issue regulations ... that include standards applicable to facilities" covered by Title III. 42 U.S.C. 12186(b). These standards must "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board" ("Access Board").[2] 42 U.S.C. § 12186(c).

Pursuant to this statutory authority, the DOJ has issued voluminous regulations implementing Title III. *See generally* 28 C.F.R., part 36. Significant to this case is ADAAG § 4.33.3, which requires that wheelchair-bound spectators be afforded "lines of sight comparable to those for members of the general public." *Id.* Specifically, at issue in this case is whether the Court must give deference to the DOJ's position that § 4.33.3 requires that wheelchair spaces must be situated in such a manner as to give wheelchair-bound spectators a clear line of sight over standing spectators. *See Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct.

---

2. The Access Board is a federal agency that was created by the Rehabilitation Act of 1973. *See* 29 U.S.C. § 792(a). The ADA required that the Access Board, within nine months of July 26, 1990, to issue "minimum guidelines" to supplement the Board's "existing Minimum Guidelines and Requirements for Accessible Design." 42 U.S.C. § 12204(a).

2381, 129 L.Ed.2d 405 (noting that an agency's interpretation of its own regulation must be given deference so long as it is not "plainly erroneous or inconsistent" with the regulation).

## B. *The DOJ's Current Interpretation is Reasonable*

 Courts are required to "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University*, 512 U.S. at 512, 114 S.Ct. 2381. In other words, the court need not "decide which among several competing interpretations best serves the regulatory purpose[; r]ather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (internal quotation marks and citations omitted).

 Here, the Court is satisfied that the DOJ's current position on ADAAG § 4.33.3 is reasonable. Title III requires that public accommodations be "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a). Title III also requires that persons with disabilities be afforded "the full and equal enjoyment of ... public accommodation[s]." 42 U.S.C. § 12182(a). ADAAG § 4.33.3 requires that disabled individuals who use wheelchairs for mobility be afforded lines of sight that are comparable to non-disabled individuals. The DOJ's interpretation—that wheelchair-bound spectators be afforded lines of sight over standing spectators at events where spectators are expected to stand—is wholly consistent with these provisions.

Moreover, although courts are divided on whether the DOJ's position must be given deference, *see infra,* no court to consider the issue has concluded that the DOJ's position is unreasonable. *See Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579, 584–85 (D.C.Cir.1997) (finding that ADAAG § 4.33.3 is "suscepti-

ble to [the DOJ's] present interpretation" and that it was therefore reasonable); *cert. denied,* 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998); *United States v. Ellerbe Becket, Inc.,* 976 F.Supp. 1262, 1268–69 (D.Minn.1997) (same); *Caruso v. Blockbuster–Sony Music Entertainment Centre at the Waterfront,* 193 F.3d 730 (3d Cir. 1999) (noting that the DOJ's position is "plausible and ... consistent with the ADA's purpose of enabling people with disabilities to share equally in the benefits provided by a public accommodation"); *Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698 (D.Or.1997) (noting that "[t]he ADA provides ample legal authority to support" a requirement that public accommodations provide lines of sight over standing spectators during events at which spectators are expected (or even encouraged) to stand).

 That the DOJ interpretation is reasonable, however, is not the end of the Court's inquiry. As the parties' arguments and relevant case law acknowledge, the analysis of whether the Court must defer to the DOJ's position requires the Court to consider whether the interpretation represents "a fundamental modification of its previous interpretation." *Paralyzed Veterans of America,* 117 F.3d at 586; *see also Thomas Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381 ("we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."). This determination begins with an examination of the unique procedural history behind § 4.33.3.

## C. *Procedural History of the Adoption of § 4.33.3*

Section 4.33.3 is found in Appendix A to Title 28, part 36 of the Code of Federal Regulation. It reads:

**Placement of Wheelchair Locations.** Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location ....

*Id.* Without giving any notice and without eliciting any comments, the DOJ has since 1994 interpreted § 4.33.3 to require lines of sight over the heads of standing spectators:

In addition to requiring companion seating and dispersion of wheelchair locations, [Standard 4.33.3] requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand. This can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient additional elevation for wheelchair locations placed at the rear of seating sections to allow those spectators to see over the spectators who stand in front of them.

1994 DOJ TAM § III–7.5180.

Standard 4.33.3 was first proposed by the Access Board on January 22, 1991. At that time, it stated: "Placement of Wheelchair Locations. Wheelchair areas shall be an integral part of any fixed seating plan and shall be dispersed throughout the seating area. They shall ... be located to provide lines of sight comparable to those for all viewing areas." Proposed Rules, Architectural and Transportation Barriers Compliance Board, 56 Fed.Reg. 2296–01, 2380 (Jan. 22, 1991). Accompanying proposed § 4.33.3 was a public notice regarding the proposed rule, inviting comments regarding the issue of lines of sight over standing spectators:

Section 4.33.3 provides that seating locations for people who use wheelchairs shall be dispersed throughout the seating area and shall be located to provide lines of sight comparable to those for all viewing areas. This requirement appears to be adequate for theaters and concert halls, but may not suffice in sports arenas or race tracks where the audience frequently stands throughout a large portion of the game or event. In alterations of existing sports arenas, accessible spaces are frequently provided at the lower part of a seating tier projecting out above a lower seating tier or are built out over existing seats at the top of a tier providing a great differential in height. These solutions can work in newly constructed sports arenas as well, if sight lines relative to standing patrons are considered at the time of the initial design. The Board seeks comments on whether full lines of sight over standing spectators in sports arenas and other similar assembly areas should be required.

56 Fed.Reg. at 2314.

A month later, on February 22, 1991, the DOJ published a notice in which it proposed to adopt the Access Board's Proposed Guidelines "with any amendments made by the [Access Board] during the rulemaking process." Proposed Rules, Department of Justice, 56 Fed.Reg. 7452–01, 7478–79 (Feb. 22, 1991). The DOJ notice stated that "any comments" on the

Access Board's Proposed Guidelines should be sent directly to the Board. *Id.* at 7479.

Five months later, on July 26, 1991, the Access Board published its proposed final guidelines, including comments regarding proposed § 4.33.3 with respect to the issue of lines of sight over standing spectators:

> Comment. The [Board] asked questions regarding ... lines of sight over standing spectators in sports arenas and other similar assembly areas.... Many commenters ... recommended that lines of sight should be provided over standing spectators. Response .... The issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities.

Rules and Regulations, Architectural and Transportation Barriers Compliance Board, 56 Fed.Reg. 35408–01, 35440 (July 26, 1991).

On the same day that the Access Board issued its proposed guidelines, including the above comment, the DOJ promulgated § 4.33.3, which is worded identically to the Access Board's final proposed text. The DOJ did not explicitly adopt the Board's commentary, but instead issued this general statement:

> The Department put the public on notice, through the proposed rule, of its intention to adopt the proposed [guidelines], with any changes made by the Board, as the accessibility standards. As a member of the Board and of its ADA Task Force, the Department participated actively in the public hearings held on the proposed guidelines and in preparation of both the proposed and final versions of [the guidelines.] ... [All] comments on the Department's proposed rule ... have been addressed adequately in the final [guidelines]. Largely in response to comments, the

Board made numerous changes from its proposal.

Rules and Regulations, Department of Justice, 56 Fed.Reg. 35544–01, 35585 (July 26, 1991).

### D. *Defendant's Argument that the DOJ's Current Position is Inconsistent with its Previous Position*

■ Defendant argues that, based on this link between the DOJ and the Board in the rulemaking process, along with the DOJ's adoption of the text of § 4.33.3 (and its general statement approving of the Board's changes to the proposed guidelines), the Board's commentary regarding the intent to address the issue of standing spectators at a future date must be imputed to the DOJ. Therefore, under defendant's reasoning, the DOJ's position at the time of the promulgation of § 4.33.3 was that it did not address the issue of standing spectators—a position it was not free to change in 1994 without first going through the notice-and-comment procedure required by APA. *See* 5 U.S.C. § 553; *Paralyzed Veterans,* 117 F.3d at 579 ("To allow an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine [the] APA requirements."); *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 88, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) ("APA rulemaking would still be required if [an agency] adopted a new position inconsistent with any of the [agency's] existing regulations.").

The four courts that have considered this issue are split down the middle. *See Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579 (D.C.Cir.1997) (Board commentary not binding on DOJ; DOJ's position on § 4.33.3 is entitled to deference), *cert. denied,* 523 U.S. 1003, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998); *United States v. Ellerbe Becket, Inc.,* 976 F.Supp.

1262 (D.Minn.1997) (same); *Caruso v. Blockbuster–Sony Music Entertainment Centre at the Waterfront*, 193 F.3d 730 (3d Cir.1999) (DOJ "implicitly adopted" the Board's commentary; DOJ's position on § 4.33.3 is not entitled to deference); *Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698 (D.Or.1997) (attributing Board's commentary to the DOJ; DOJ's position is not entitled to deference). A brief review of these opinions is helpful to the Court's analysis.

In *Paralyzed Veterans*, a group of paralyzed veterans brought suit against an athletic arena to require the arena to provide lines of sight over standing spectators. *Id.* at 580. The court began its analysis with an acknowledgment that agency interpretations are generally given deference, so long as they are reasonable. *Id.* at 584. Because the court concluded that § 4.33.3 could plausibly be interpreted in the manner suggested by the DOJ, it was reasonable. *Id.* at 584–85. This conclusion, however, did not end the inquiry, because the court was required to consider whether the DOJ's current position was "a fundamental modification of its previous interpretation" that would require formal modification through the notice-and-comment process. *Id.* at 586; 5 U.S.C. § 553(b)-(c) (requiring notice be given and comment be permitted before an agency engaged in "rule making"); 5 U.S.C. § 551(5) (defining "rule making" to include "repeal" and "amendment").

The court determined that the Board's commentary should not be attributed to the DOJ; although it acknowledged that it was plausible that the DOJ, at the time of § 4.33.3's adoption, held the same position on standing spectators as did the Board, the court also acknowledged that this was not the only reasonable inference to be drawn. *Paralyzed Veterans*, 117 F.3d at 587. In the end, although conceding "the

issue [is] not easy," the court reasoned that the Board's commentary should not be attributed to the DOJ because (1) the DOJ did not explicitly adopt the commentary; (2) it did not comment on the Board's concerns regarding standing spectators; (3) it did not imply the regulation did not address the issue of standing spectators, and (4) because the DOJ was required only to adopt regulations that were **consistent with** the **minimum requirements** issued by the Board, nothing prevented the DOJ from imposing greater burdens on entities covered by the regulations. *Id.* at 587. Because the court concluded that the DOJ "never authoritatively adopted a position contrary to" that set forth in the 1994 TAM, it deferred to the DOJ's position and held that the athletic arena was required to provide wheelchair-bound spectators with lines of sight over standing spectators.

The court in *United States v. Ellerbe Becket, Inc.*, 976 F.Supp. 1262 (D.Minn. 1997), adopted wholesale the reasoning and holding of the D.C. Circuit in *Paralyzed Veterans*.

In contrast to *Paralyzed Veterans* and *Ellerbe Becket* stand *Caruso v. Blockbuster–Sony Music Entertainment Centre at the Waterfront*, 193 F.3d 730 (3d Cir.1999) and *Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698 (D.Or. 1997).

In *Caruso*, a wheelchair-bound patron sued a music and entertainment facility because their wheelchair spaces had no lines of sight over standing spectators. 193 F.3d at 731. The Third Circuit held that the DOJ "implicitly adopted" the Board's commentary regarding § 4.33.3 and therefore its current position represents a change from its intent at the time of § 4.33.3's promulgation, rendering its current position on § 4.33.3 unworthy of deference. *Id.* at 736–37 (citing *Thomas*

*Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381 ("[W]e must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.")). The court attributed the Board's commentary to the DOJ for a number of reasons: (1) The DOJ referred all comments on the proposed rules to the Board; (2) the DOJ relied on the Board to make adequate changes based on those comments; (3) the Board specifically changed the language of § 4.33.3 in response to comments and explained that change in its commentary; (4) the DOJ was a "member of the Board" and "participated actively . . . in preparation of both the proposed and final versions of the [guidelines]"; and (5) the DOJ's commentary upon the issuance of the Board's final guidelines that the Board adequately addressed all comments. *Caruso,* 193 F.3d at 736. In holding that it could not defer to the DOJ's current position on § 4.33.3, the Third Circuit agreed with the D.C. Circuit's observation in *Paralyzed Veterans* that "the issue is not easy," but nevertheless "respectfully disagree[d]" with the D.C. Circuit's contrary conclusion.

The Court in *Independent Living* reached the same conclusion as did the court in *Caruso,* employing similar reasoning. In *Independent Living,* a disabled person brought an action against the owner and operator of a sports arena. 982 F.Supp. at 706. At issue was whether the court should defer to the DOJ's current position on § 4.33.3. The court acknowledged that the DOJ's current position was a reasonable one. *Id.* at 734. However, it found that the DOJ's current position represented an impermissible change from its previous position, as represented by the Board's commentary regarding § 4.33.3. The court attributed the Board's commentary to the DOJ for a number of reasons:

First, the DOJ did not make its "comments" as part of the notice-and-comment procedure; rather, it relied on the Board to fulfill this role, and it found these comments "adequate" in the general statement it made at the time of the promulgation of § 4.33.3. *Id.* at 740–41 ("If the Access Board's response to public comments regarding individual Guidelines was not implicitly incorporated by DOJ, then the agency did not respond to those comments . . . .").

Second, the DOJ referred any comments regarding the proposed regulations to the Board. If the Board's commentary was not binding on the DOJ, then the notice-and-comment procedure would be "an empty gesture." *Id.* at 741; *see Paulsen v. Daniels,* 413 F.3d 999, 1008 (9th Cir. 2005) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.").

Third, the DOJ adopted the Access Board's commentary by virtue of its general statement that the comments from the public were "addressed adequately in the final ADAAG" and by the "numerous changes" that the Access Board had made in response to those comments. *Independent Living,* 982 F.Supp. at 741.

Finally, the court was persuaded by the unique, close relationship between the Board, which was required to establish the minimum standards for the ADA regulations, and the DOJ, which was required to promulgate ADA regulations that were consistent with those minimum standards. *Id.* The court found this relationship all the more persuasive in light of the DOJ's admission that the two agencies worked closely together in drafting those guidelines. Therefore, the Court held that the DOJ's position was not entitled to deference.

All four of these cases agree on at least one issue: In order for the DOJ's position to be entitled to deference, the DOJ must not have previously held the position espoused by the Board in its commentary. In other words, these courts agree that if the Board's commentary is imputed upon or attributed to the DOJ, then the DOJ's current position is not entitled to deference. Despite arguments to the contrary by the DOJ,[3] the Court concludes that this inquiry is dispositive as well.

The Court agrees wholeheartedly with both the Third and D.C. Circuits that this is a difficult issue. If the DOJ explicitly adopted the Board's commentary, it would be easy. However, the DOJ did not explicitly adopt the Board commentary, and the Court is instead left with the tortured history of the promulgation of § 4.33.3 set forth above. In the end, the Court believes that the Third Circuit's approach in *Caruso* represents the most principled analysis of the present issue. For that reason, the Court adopts the reasoning and conclusion set forth therein.

In this Court's view, the most important factor in reaching the conclusion that the Board's commentary must be imputed to the DOJ is the DOJ's comment regarding the Board's actions during the notice-and-comment period. The DOJ emphasized that the public was put on notice of the DOJ's intent to adopt the guidelines proposed by the Board, with any changes made by the Board. *See* 56 Fed.Reg. 35585. The DOJ noted its own "active participation" in the public hearings on the proposed guidelines and "in preparation of both the proposed and final versions of" the guidelines. *Id.* Further, it noted that the Board had adequately addressed all comments made by the public. *Id.* Finally, the DOJ noted the Board's "numerous changes" that were made in arriving at the final guidelines. *Id.* In this Court's view, this statement amounts to a broad approval of the Board's actions, including the Board's commentary during the rulemaking process. In light of the DOJ's public affirmation of the Board's commentary at the time it promulgated § 4.33.3, and in the absence of any public expressions of contrary intent, the Board's commentary is fairly attributed to the DOJ. Having adopted this commentary as its own, the DOJ was not free to change its interpretation in 1994 without first going through the notice-and-comment process, which it concedes it did not.

---

3. The DOJ argues that both the Board's commentary at the time of the notice of the proposed guidelines and at the time of the final guidelines leave open the possibility that the Board did not interpret § 4.33.3 as not addressing the issue of lines of sight over standing spectators. Amicus Brief at 16–19. At the time of the proposed guidelines, the Board's reference to "full lines of sight" could be viewed as its consideration of what technical or qualitative specifications should govern the requirement of lines of sight over standing spectators, not *whether* lines of sight over standing spectators must be provided. *Id.* Likewise, the Board's commentary at the time of the final guidelines could be viewed as its contemplation of the development in the future of detailed guidelines that contemplate further technical or qualitative refinements.

*Id.* The Court is not persuaded by this argument. The Board, at the time of the final guidelines, after noting that "many commenters ... recommended that lines of sight ... be provided over standing spectators," stated only that "[t]he issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities." 56 Fed.Reg. 35440. Had the Board in any way indicated that it intended to *further* address, or to *more thoroughly address* the issue, the Court might be inclined to give this argument some weight. The Board did not. Nor is the Court convinced that the Board's current position (as set forth in its 1998 Technical Assistance Manual), which is in accord with the DOJ's current position, accurately portrays its original interpretation of § 4.33.3.

The Court does not mean to suggest that a rule that sports stadiums and other venues where spectators are expected to stand during all or part of a performance must provide to wheelchair-bound patrons lines of sight over standing spectators is not desirable. Indeed, even the *Caruso* court, whose reasoning upon which defendant relies, acknowledged that such a rule "has much to recommend," a sentiment with which this Court certainly agrees.

*Caruso,* 193 F.3d at 737. Were the Court to write on a clean slate, the Court would be tempted to hold that § 4.33.3 requires lines of sight over standing spectators. After all, a law requiring that individuals with disabilities be able to attend exciting sporting events has little meaningful effect if those individuals are deprived of viewing, in the words of the plaintiff here, the parts they "want to see the most." Indeed, such a rule would definitely be in keeping with the purpose of Title III of the ADA, which is to provide individuals with disabilities with access to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

One argument raised at the hearing on this matter by defense counsel cannot pass without comment. Defense counsel's efforts to conflate the position of a wheelchair-bound quadriplegic with, to use counsel's phrase, a "height-disadvantaged" person such as herself, is not persuasive. Counsel's argument focuses solely on the height differential between individuals who use wheelchairs for mobility and ambulatory individuals; however, "height-disadvantaged" ambulatory individuals have options that are not available to those who must use wheelchairs. *Cf. Independent Living,* 982 F.Supp. at 733 ("[A]mbulatory patrons can move around or angle their bodies to obtain a better view, or stand on their chairs. Small children may be held aloft by their parents. . . . While some ambulatory spectators occasionally have an obstructed view, that experience is the rule, rather than the exception, for those who attend Rose Garden events in a wheelchair. It is no answer to say that some ambulatory spectators may also have obstructed sightlines."). Moreover, the height differential which counsel references is not nearly as pronounced as that experienced by a person who must sit in a place where other adults—short and tall alike—may stand to their full height or may maneuver their bodies to gain maximum visual access. *Compare id.* (noting testimony from a senior project architect that indicated that the average wheelchair-bound spectator's view is that of a person who is 42 inches (or three feet, six inches tall)) *with* Center for Disease Control 2000 Growth Charts: United States, available at <<http://www.cdc.gov/nchs/data/nhanes/growthcharts/set3/all.pdf>> (noting that the median (50th percentile) height for a five-year-old child in the United States is 42 inches).

Although the Court does not find this particular argument by counsel to be persuasive, the Court is constrained by the DOJ's *original* interpretation of § 4.33.33; that is, the original position of the Board that § 4.33.3 simply does not address the question of lines of sight over standing spectators. In light of this position, the Court's ruling must be in favor of the defendant.

**E. *Ruling on ADA Claim***

Having concluded that § 4.33.3 must be interpreted as not addressing the issue of lines of sight over standing spectators, the Court **DENIES** plaintiff's Motion for Summary Judgment on the ADA claim and **GRANTS** defendant's Motion for Summary Judgment as to the ADA claim.

## VI. State Law Claims

As plaintiff's counsel has conceded in a previous proceeding, plaintiff's state-law claims are dependent upon a finding of an ADA violation. *See* July 29, 2005, Transcript at 19 (attached to Motion as Ex. D) ("The state[-]law claims are predicated on the violation of the federal claims. So if we lose the federal claim, we lose the state[-]law claim."). Having found no such violation as a matter of law, the Court **DENIES** plaintiff's Motion for Summary Judgment as to the state-law claims and **GRANTS** defendant's Motion for Summary Judgment as to the state-law claims.

## VII. Conclusion

As set forth above, the Court **DENIES** plaintiff's Motion for Summary and **GRANTS** defendant's Motion for Summary Judgment. Summary Judgment is granted in favor of defendant as to all claims.

The Clerk shall close the case.

IT IS SO ORDERED.