**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT MILLER,
                    *Plaintiff-Appellant,*

v.

THE CALIFORNIA SPEEDWAY
CORPORATION,
                    *Defendant-Appellee.*

No. 06-56468

D.C. No.
CV-01-00434-SGL

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen G. Larson, District Judge, Presiding

Argued and Submitted
April 11, 2008—Pasadena, California

Filed August 8, 2008

Before: William C. Canby, Jr. and Jay S. Bybee,
Circuit Judges, and Roger Hunt,* District Judge.

Opinion by Judge Bybee

---

*The Honorable Roger Hunt, Chief United States District Judge for the
District of Nevada, sitting by designation.

10185

## COUNSEL

Mark D. Potter and Russell C. Handy, Center for Disability Access, LLP, San Marcos, California, for the plaintiff-appellant.

John S. Lowenthal and Bryan R. Reid, Lewis Brisbois Bisgaard & Smith, LLP, San Bernardino, California, for the defendant-appellee.

Karen L. Stevens, United States Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for the Amicus United States.

Carolyn R. Young, Chapman University School of Law, Orange, California; Paula D. Pearlman, Disability Rights Legal Center, Los Angeles, California, for the Amicus San Diego Polio Survivors.

---

## OPINION

BYBEE, Circuit Judge:

Appellant Robert Miller is a big fan of NASCAR, attending from three to six events a year at the California Speedway in Fontana. He also happens to be a quadriplegic who uses an electric wheelchair. When the fans immediately in front of Miller stand during the most exciting parts of the race, they block his view of the action.

Appellee California Speedway Corporation ("Speedway") opened the California Speedway in 1997. The track and stadium, which sponsors NASCAR events, has two areas for wheelchairs in the grandstands; the cheaper seats are located at the bottom of the stadium, and the more expensive seats are located near the top. Miller always purchases tickets for the top row.

Miller brought this suit, claiming that Speedway has violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and a Department of Justice regulation requiring that wheelchair areas "provide people with physical disabilities . . . lines of sight comparable to those for members of the general public." 28 C.F.R. pt. 36, App. A, § 4.33.3 (italics omitted). The district court granted Speedway's motion for summary judgment on the ground that the DOJ regulation does not address the question of lines of sight over standing spectators. *Miller v. California Speedway Corp.*, 453 F. Supp. 2d 1193, 1204 (C.D. Cal. 2006).

As the district court noted, two federal courts of appeals and two federal district courts have addressed this precise question and have reached opposite conclusions. The Third Circuit and the District of Oregon concluded that the DOJ's regulation does not require lines of sight over standing spectators. *Caruso v. Blockbuster-Sony Music Entm't Centre at the Waterfront*, 193 F.3d 730, 736-37 (3rd Cir. 1999); *Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 742-43 (D. Oregon 1997). By contrast, the D.C. Circuit and the District of Minnesota found that the DOJ's regulation does require lines of sight over standing spectators. *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 587 (D.C. Cir. 1997); *United States v. Ellerbe Becket, Inc.*, 976 F. Supp. 1262, 1269 (D. Minn. 1997). We agree with the D.C. Circuit and reverse the judgment of the district court.

## I.   FACTS AND PROCEEDINGS BELOW

A.   *The Regulatory Scheme*

### 1.   The Americans With Disabilities Act

[1] Title III of the ADA prohibits discrimination against any individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommoda-

tion." 42 U.S.C. § 12182(a). Discrimination includes "a failure to remove architectural barriers" or "where . . . removal of a barrier . . . is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods." 42 U.S.C. § 12182(b)(2)(A)(iv), (v). The ADA further requires that newly constructed facilities be "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a)(1). The ADA directs the Attorney General to "issue regulations . . . that include standards applicable to facilities" covered by Title III and to provide "appropriate technical assistance manuals to individuals or entities with rights or duties" under Title III. 42 U.S.C. §§ 12186(b), 12206(c)(3). Congress instructed the Attorney General to issue regulations within one year of the enactment of the ADA. 42 U.S.C. § 12186(b).

**[2]** The process by which the Attorney General promulgates his regulations has an unusual twist. Congress mandated that the Attorney General's regulations "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board," 42 U.S.C. § 12186(c), commonly referred to as the "Access Board." The Access Board is an independent federal agency comprised of twenty-five persons—thirteen presidentially-appointed individuals and representatives from twelve federal agencies, including the DOJ. 29 U.S.C. § 792(a)(1). The Board is directed to establish "minimum guidelines and requirements for the standards issued" under Title III of the ADA, 29 U.S.C. § 792(b)(3)(B), and to "develop advisory information for, and provide appropriate technical assistance to, individuals or entities with rights or duties under regulations prescribed" under Title III, 29 U.S.C. § 792(b)(2). In sum, the Board establishes "minimum guidelines" for Title III, but the DOJ promulgates its own regulations, which must be consistent with—but not necessarily identical to—the Board's guidelines. Congress instructed the Board to issue its

guidelines within nine months of the enactment of the ADA. 42 U.S.C. § 12204(a).

2.   The Access Board Guidelines and DOJ Standards

In January 1991, six months after the enactment of the ADA, the Access Board published its first proposed ADA Accessibility Guidelines, known as the ADAAG. 56 Fed. Reg. 2296 (1991). Initially, the provision discussing assembly areas provided:

> 4.33.3 Placement of Wheelchair Locations. Wheelchair areas shall be an integral part of any fixed seating plan and shall be dispersed throughout the seating area. They shall . . . be located to provide lines of sight comparable to those for all viewing areas.

56 Fed. Reg. at 2380. In commentary on its proposed rules, the Access Board noted that the "lines of sight" requirement

> appears to be adequate for theaters and concert halls, but may not suffice in sports areas or race tracks where the audience frequently stands throughout a large portion of the game or event. In alterations of existing sports arenas, accessible spaces are frequently provided at the lower part of a seating tier projecting out above a lower seating tier or are built out over existing seats at the top of a tier providing a great differential in height. These solutions can work in newly constructed sports arenas as well, if sight lines relative to standing patrons are considered at the time of initial design. The Board seeks comments on whether the full lines of sight over standing spectators in sports arenas and other similar assembly areas should be required.

56 Fed. Reg. at 2314.

One month later, in February 1991, the DOJ published its own Notice of Proposed Rulemaking. 56 Fed. Reg. 7452 (1991). With respect to the standards for new construction and alterations, the proposed rules stated that the standards would be published as Appendix A, and that Appendix A would be the ADAAG proposed by the Access Board in its January 1991 notice of proposed rulemaking, together "with any amendments made by the [Access Board] during its rulemaking process." 56 Fed. Reg. at 7478, 7492. "The Department proposes to adopt these guidelines as the accessibility standard applicable under this rule." 56 Fed. Reg. at 7478-79. The DOJ requested that any comments on the Access Board's notice of proposed rulemaking be sent to the Access Board. 56 Fed. Reg. at 7479.

In July 1991, the Access Board published its final ADAAG. 56 Fed. Reg. 35,408 (1991). Section 4.33.3 was modified to read, "Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." 56 Fed. Reg. at 35,514 (italics omitted). The Board addressed the problem of "lines of sight over standing spectators in sports arenas and other similar assembly areas" and noted that "[m]any commenters also recommended that lines of sight should be provided over standing spectators." 56 Fed. Reg. at 35,440. To this, the Access Board simply stated that "the issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities," *id.*, guidelines the Access Board, evidently, had not proposed.

The very same day that the Access Board finalized its guidelines, the DOJ issued its final Title III regulations. 56 Fed. Reg. 35,544 (1991). As the DOJ had previously announced, it "adopt[ed] the ADAAG as the accessibility standard applicable under this rule." 56 Fed. Reg. at 35,585. The DOJ incorporated the ADAAG—including § 4.33.3—

verbatim in Appendix A. *See* 28 C.F.R. 36.406 & App. A. The commentary accompanying the regulations stated that the "[DOJ] put the public on notice, through the proposed rule, of its intention to adopt the proposed ADAAG, with any changes made by the Board, as the accessibility standards." 56 Fed. Reg. at 35,586. The DOJ further indicated that "comments on the Department's proposed rule . . . have been addressed adequately in the final ADAAG. Largely in response to comments, the Board made numerous changes from its proposal." *Id*. The DOJ did not expressly address lines of sight.

3.    The DOJ's *Technical Assistance Manual*

Title III's new construction provisions, including § 4.33.3, became effective in January 1993. That same year, pursuant to Title III's directive to provide technical assistance to covered entities, the DOJ published a *Technical Assistance Manual* ("TAM"). *See* 42 U.S.C. § 12206(a), (c)(2)(C). The 1993 TAM was silent on § 4.33.3. The 1994 published supplement to the TAM, however, provided an interpretation for § 4.33.3 that was more aggressive than the Access Board's commentary:

> In addition to requiring companion seating and dispersion of wheelchair locations, ADAAG requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand. This can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient additional elevation for wheelchair locations placed at the rear of seating sections to allow those spectators to see over the spectators who stand in front of them.

TAM § III-7.5180 (1994 Supp.).

4.    The Access Board's Subsequent Guidelines

In 1992, the Access Board repeated its intent "to address the issue of lines of sight over standing spectators in the guidelines for recreational facilities which will be proposed at a future date." 57 Fed. Reg. 60,612, 60,618 (1992). It requested "comments on the design issues associated with providing integrated and dispersed accessible seating locations with a clear line of sight over standing spectators in arenas, stadiums or other sports facilities." *Id*. The Access Board also noted that during the initial notice and comment procedures "[a]n overwhelming majority of responses favored including a provision requiring lines of sight over standing spectators in sports arenas and other similar assembly areas." *Id*.

In November 1999, the Access Board finally proposed amendments to its guidelines to address the standing spectators problem. 64 Fed. Reg. 62,248, 62,501-02 (1999). These were adopted in July 2004. 69 Fed. Reg. 44,083 (2004). Guideline 802.2 now distinguishes between "lines of sight over seated spectators" and "lines of sight over standing spectators." 69 Fed. Reg. at 44,391-93. Guideline 802.2.2.1 reads: "Where standing spectators are provided lines of sight over the heads of spectators standing in the first row in front of their seats, spectators seated in *wheelchair spaces* shall be afforded lines of sight over the heads of standing spectators in the first row in front of *wheelchair spaces*." 69 Fed. Reg. at 44,392-93. The DOJ has not adopted the Access Board's 2004 guidelines. Instead, the DOJ's current regulation of lines of sight requirements remains 28 C.F.R. pt. 36, App. A, § 4.33.3, as interpreted by TAM § III-7.5180 (1994 Supp.).[1]

_____

[1]The DOJ has informed us that on June 17, 2008, the DOJ published proposed regulations that would amend the DOJ's ADA regulations. 73 Fed. Reg. 34,508 (2008). The proposed regulations would adopt the

B.  *The Proceedings*

On October 25, 2001, Miller filed his district court complaint, alleging, among other things, that Speedway violated Title III of the ADA, 42 U.S.C. § 12181 *et seq.* On cross motions for summary judgment, the district court granted judgment for Speedway. The court acknowledged that "the DOJ's current position on ADAAG § 4.33.3 is reasonable" and was consistent with Title III of the ADA and that "[w]ere the [c]ourt to write on a clean slate, the [c]ourt would be tempted to hold that § 4.33.3 requires lines of sight over standing spectators." *Miller*, 453 F. Supp. 2d at 1198, 1204. It found, however, that the DOJ had bound itself to the Access Board's commentary implying that the Access Board's 1991 guidelines (and, consequently, the DOJ's 1991 standards) did not address the question of lines of sight over standing spectators. *Id.* at 1203. Accordingly, the court concluded that the DOJ's current position—found in the 1994 Supplement to the TAM—that facilities must provide lines of sight over standing spectators was " 'a fundamental modification of its previous interpretation' " and had to be adopted through notice-and-comment rulemaking. 453 F. Supp. 2d at 1201 (quoting *Paralyzed Veterans of America*, 117 F.3d 579, 586 (D.C. Cir. 1997)). It thus rejected the D.C. Circuit's interpretation in *Paralyzed Veterans* and agreed with the Third Circuit's opinion in *Caruso v. Blockbuster-Sony Music Entertainment Centre*, 193 F.3d 730 (3d Cir. 1999). *Miller*, 453 F. Supp. 2d at 1203. Miller appeals.[2]

_____

Access Board's 2004 guidelines, including Guideline 802.2.2.1, which requires lines of sight over standing spectators. The regulations have not yet been adopted, and, even if adopted, will not apply retroactively. We understand that these are clarifying regulations, not an admission that the DOJ's original guidelines did not require lines of sight over standing spectators.

[2]A district court's grant of summary judgment is reviewed *de novo. Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). There are no genuine issues of material fact, so our sole inquiry is whether the district court correctly applied the law. *Id.*

## II.   ANALYSIS

We begin our analysis by stating what is *not* at issue in this case. This case does not involve whether the DOJ has reasonably interpreted the ADA within the meaning of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). No party to the litigation challenges the substantive validity of § 4.33.3, and sensibly, no party has argued that the DOJ has exceeded its authority under the ADA. Nor is § 4.33.3 subject to serious challenge as "arbitrary and capricious." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-44 (1983). Although this is a private suit by Miller against the Speedway for violating the ADA, the parties all concede that the Attorney General's lines-of-sight regulations would clearly pass muster if challenged under the ADA. *See Indep. Living Res.*, 982 F. Supp. at 734 ("DOJ reasonably could have concluded that lines of sight over standing spectators are necessary . . . . The ADA provides ample legal authority to support such a requirement."); *see also Paralyzed Veterans*, 117 F.3d at 582-83 ("[A]ppellants do not contend that the Department's interpretation of the regulation is unfaithful to the governing statute.").

### A.   *The TAM as the DOJ's Interpretation of Its Own Regulation*

**[3]** What is challenged here is whether the lines-of-sight provision in the Attorney General's 1994 Supplement to the TAM is a valid construction of § 4.33.3. While *Chevron* addresses what kind of deference we must afford an agency in the interpretation of the *statute* it has been charged with enforcing, *see* 467 U.S. at 842, here we are dealing with the leeway we must grant an agency in the interpretation of its own *regulations*. We must give an agency's interpretation of its own regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). "In other words, we must defer to the [agency's] interpretation unless

an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.' " *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). We have explained that "[w]hen the meaning of regulatory language is ambiguous, the agency's interpretation controls 'so long as it is "reasonable," that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.' " *Or. Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1131 (9th Cir. 2003) (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991)).

Furthermore, we have previously held that the TAM itself is entitled to substantial deference. "The guidance provided in the technical assistance manual is an interpretation of the DOJ's regulation and, as such, is entitled to significant weight as to the meaning of the regulation." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 875-76 (9th Cir. 2004) (citations omitted). Where "[t]he DOJ's interpretation [in the TAM] is entirely consistent with the regulation, . . . it is due deference." *Botosan v. Paul McNally Realty*, 216 F.3d 827, 834 (9th Cir. 2000). Accordingly, "[t]he Justice Department's interpretation of its own regulations, such as the Technical Assistance Manual, must also be given substantial deference and will be disregarded only if 'plainly erroneous or inconsistent with the regulation.' " *Bay Area Addiction Research v. City of Antioch*, 179 F.3d 725, 732 n.11 (9th Cir. 1999) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512)).

**[4]** The language of § 4.33.3 requiring "lines of sight comparable to those for members of the general public" is ambiguous. Indeed, both the Third and the D.C. Circuits, although they ultimately reach opposite conclusions on the merits, agree that the plain language of the regulation is ambiguous and subject to differing interpretations. *See Caruso*, 193 F.3d at 733 ("In the end it seems that both interpretations of the

'lines of sight' language are plausible."); *Paralyzed Veterans*, 117 F.3d at 583 ("the phrase is ambiguous"). We agree that the phrase "lines of sight" in § 4.33.3 is subject to several interpretations.

One possible interpretation is that the phrase means that wheelchair patrons must have a view without physical obstructions. *See Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 788-89 (5th Cir. 2000). We have already held that this reading is too narrow to be compelled by the language of § 4.33.3, and the Attorney General is entitled to read the provision more broadly. *Regal Cinemas*, 339 F.3d at 1132.

A more plausible interpretation of the phrase is that it means that wheelchair areas are to be dispersed throughout a facility, such that wheelchair users have a variety of horizontal viewing angles from which to choose. *See Caruso*, 193 F.3d at 732. This ensures that wheelchair patrons at a football game are not all stuck, for example, behind the goalposts. This interpretation is supported by the fact that § 4.33.3 also requires a "choice of admission prices" to account for the difference between an end zone and a mid-field seat.

Alternatively, the phrase can be read to require more than horizontal dispersal; it could be read to require vertical dispersal as well, so that patrons have a choice of seats—for example, between the orchestra and the loges—to obtain a different viewing angle. Under this reading, the phrase "lines of sight" would refer to the angle of sight between the viewer and the stage, screen, or playing field. The latter definition of "lines of sight" would encompass both the notion of a horizontal line of sight and a vertical line of sight.

Finally, yet another interpretation does not merely involve the horizontal or vertical dispersal of the wheelchair seating options, but rather suggests that the line of sight of a wheelchair patron must be comparable to the line of sight of a non-wheelchair patron who has chosen the same seat. Under this

interpretation it is easy to see that at some events (principally sporting events), a "comparable" line of sight would encompass an unobstructed line of sight when other patrons are standing. When the crowd is generally standing, most spectators can also stand and, in doing so, enable themselves to substantially see the event. Therefore, in order to be given a comparable line of sight, wheelchair users must also be able to see the event when the crowd is standing.

Any of these interpretations would be a reasonable reading of the ambiguous plain language of the regulation. In fact, the phrase "lines of sight comparable to those for members of the general public" could be interpreted to require a combination of the proposed interpretations. That is, it is possible that a comparable line of sight means that the view is unobstructed by physical obstacles, that the seats must be horizontally and vertically dispersed, and that wheelchair patrons must be able to see over standing patrons.

**[5]** In its 1994 supplement to the TAM, the DOJ made it clear that at the very least the phrase "lines of sight comparable to those for members of the general public" in § 4.33.3 required that "in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand." TAM § III-7.5180 (1994 Supp.). The Attorney General's interpretation of § 4.33.3 is "neither plainly erroneous [n]or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512. As a linguistic matter it is perfectly reasonable to interpret the term "lines of sight comparable to those for members of the general public" as requiring lines of sight that are comparable in the actual conditions under which a facility operates. If spectators are widely expected to stand during the key moments of an event, then comparable lines of sight for wheelchair users could be lines of sight that enable the wheelchair users to see during those moments. If the spectators stand during the singing of the national anthem, routinely jump to their feet during the

fourth quarter, or insist on standing on their chairs during the third overtime, it does not take a fertile legal imagination to understand that relatively immobile patrons will not have a comparable line of sight.

**[6]** Furthermore, the DOJ's 1994 interpretation is consistent with the statutory requirement that the facilities be "readily accessible to" and "usable by" persons with disabilities. 42 U.S.C. § 12183(a)(1). To meaningfully use the Speedway facilities, a wheelchair patron needs to be able to see the event in the circumstances under which the race typically takes place, with a standing audience. Otherwise the Speedway race track is not "usable" as a practical matter. Because the DOJ's interpretation is a reasonable, practical construction in light of the ambiguity of the regulation, it is entitled to substantial deference.

Our decision is consistent with our treatment of the DOJ's "comparable lines-of-sight" regulations in the context of theater seating in *Regal Cinemas*, 339 F.3d at 1127. The district court had held that "the language about 'lines of sight comparable to those for members of the general public' in § 4.33.3 does not require that wheelchair-accessible seating afford patrons comparable viewing angles to those in non-accessible seating." *Id.* at 1129 (citing *Oregon Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 142 F. Supp. 2d 1293, 1297-98 (D. Or. 2001)). The district court had followed *Lara v. Cinemark USA, Inc.*, 207 F.3d 783 (5th Cir. 2000), in which the Fifth Circuit pointed out that "questions regarding 'viewing angle' did not arise until well after the DOJ promulgated section 4.33.3" and concluded that "lines of sight" referred to nothing more than "unobstructed views." *Id.* at 788-89.

**[7]** We rejected the Fifth Circuit's reasoning and reversed the district court. We concluded that "lines of sight" "[i]n the context of a movie theater, [ ] means a line extending from the viewer's eye to the points on the screen where the film is projected, taking into account the angle from the viewer's eye to

those points." *Regal Cinemas*, 339 F.3d at 1131. We framed the question as "whether it is unreasonable for DOJ to interpret 'comparable line of sight' to encompass factors in addition to physical obstructions, such as viewing angle. The answer, in light of the plain meaning of the regulation both in general and as understood in the movie theater industry, is 'no.' " *Id.* at 1132. Accordingly, we held that DOJ's interpretation of § 4.33.3 was "valid and entitled to deference." *Id.* at 1133.

**[8]** A sporting event presents a different set of challenges from a movie theater, which has a fixed screen and relatively placid patrons. By contrast, sporting events typically involve live action, moving rapidly over playing surfaces many times larger than a movie screen. When the audience—like the athletes—is in motion, arena designers, owners and patrons have a set of problems to address that are not present in a theater setting. It was not unreasonable for the DOJ to interpret "lines of sight" as the actual "line extending from the viewer's eye to the [playing field], taking into account the angle from the viewer's eye to those points." *Id.* at 1131.

### B.   *The TAM as the DOJ's Own Interpretation of the Access Board Guidelines*

**[9]** As in *Lara*, a decision we declined to follow in *Regal Cinemas*, the Speedway argues that the DOJ's position is an after-acquired view, one that "did not arise until well after the DOJ promulgated section 4.33.3." *Lara*, 207 F.3d at 788-89. Indeed, the Speedway argues not just that the DOJ's position is an after-acquired view, but that the DOJ's position on lines of sight in the 1994 TAM supplement substantially departs from the Access Board's original commentary on lines of sight. Asserting that the Access Board's commentary must be imputed to the DOJ, the Speedway contends that the DOJ's subsequent position is not entitled to substantial deference because it was not promulgated according to notice and comment rulemaking.

The district court in this case agreed that "the board's commentary must be imputed to the DOJ," although it also observed that if it were "to write on a clean slate, [it] would be tempted to hold that § 4.33.3 requires lines of sight over standing spectators." 453 F. Supp. 2d at 1203-04. In *Caruso*, the Third Circuit took a similar position, relying on

> the following factors: 1) the DOJ referred all comments to the Boards; 2) the DOJ relied on the Board to make adequate changes based on those comments; 3) the Board specifically changed the language of 4.33.3 in response to comments and explained that change in its commentary; 4) the DOJ was a 'member of the board' and 'participated actively . . . in preparation of both the proposed and final versions of the [guidelines]'; and 5) the DOJ's commentary stated that the final guidelines promulgated by the Board adequately addressed all comments.

*Caruso*, 193 F.3d at 736 (citations omitted).

The district court's point, supported by *Caruso*, is a fair one. *See Thomas Jefferson Univ.*, 512 U.S. at 512 (we must defer "unless an alternative reading is *compelled* by other indications of the Secretary's intent *at the time of the regulation's promulgation*") (emphasis added; citation omitted). After all, in its notice of proposed rulemaking, the DOJ stated that it "propose[d] to adopt [the Access Board's] guidelines as the accessibility standard under this rule." 56 Fed. Reg. at 7478-79. The same day as the Access Board published its standards, the DOJ formally "adopt[ed] the ADAAG as the accessibility standard" as its own. 56 Fed. Reg. at 35,585, and on that day, the Access Board stated that "the issue of lines of sight over standing spectators will be addressed [in the future] in guidelines for recreational facilities." 56 Fed. Reg. at 35,440.

**[10]** We understand why a reasonable reader might conclude that as of July 1991, the DOJ's new ADA regulations did not address lines of sight over standing spectators. We do not think, however, that such a reading is "compelled" by the record. *See Thomas Jefferson Univ.*, 512 U.S. at 512. When the DOJ adopted the Access Board's guidelines as its own standards, it literally adopted the *guidelines*. 28 C.F.R. § 36.406(a) ("New construction and alterations subject to this part shall comply with the standards for accessible design published as appendix A to this part (ADAAG)."). It did not adopt any other Access Board commentary, notices of proposed rulemaking, or internal memoranda. Whatever the *Access Board* thought of its own guidelines, the *Department of Justice* adopted the text of the guidelines themselves, not the Access Board's interpretation of that text. The DOJ made the Access Board's guidelines its own, and, having done so, it assumed responsibility for interpreting the standards.[3] As the Access Board has explained: "The Board's guidelines serve as the baseline for standards used to enforce the ADA and the ABA. These standards, which are maintained by other Federal agencies, such as the U.S. Department of Justice under the ADA, will be updated according to the new guidelines. *It is these standards, not the Board's guidelines, which the public must follow*." U.S. Access Board, *Americans with Disabilities Act and Architectural Barriers Act Accessibility Guidelines* n.p. (2004) ("Introduction") (emphasis added).

**[11]** There was good reason for the DOJ to adopt the text of the Access Board's guidelines. The ADA instructed the Access Board to issue minimum guidelines within nine

---

[3]The Access Board has explained the difference between its "guidelines" and the Attorney General's "standards": "Guidelines are issued by the Board, standards by designated agencies such as DOJ . . . . ADA standards issued by DOJ . . . in 1991 based on the Board's original ADA Accessibility Guidelines (ADAAG) remain the standards to follow at this time." U.S. Access Board, *Americans with Disabilities Act and Architectural Barriers Act Accessibility Guidelines* n.p. (2004) ("Answers to Common Questions About the New ADA-ABA Guidelines").

months of enactment and ordered the Attorney General to issue regulations within one year. 42 U.S.C. §§ 12186(b), 12204(a). By Washington standards, this required quick work. The Access Board's dutiful response to the mandate enabled the DOJ to get its own regulations into print on time. More importantly, the ADA mandated that the DOJ's regulations "be consistent with the minimum guidelines and requirements issued by the [Access Board]." 42 U.S.C. § 12186(c). By formally adopting the Access Board's guidelines, the DOJ ensured that its own regulations were "consistent with" the Access Board's guidelines. It seems like an easy call for the Attorney General to piggyback on the Access Board's hard work at getting the ADA up and running. Those guidelines, however, were only a launching point for the DOJ, which had to take care that its own regulations complied with the Access Board guidelines at a "minimum." *Id.* Nothing in the ADA or in the DOJ's own regulations bound the Attorney General to the Access Board so long as the DOJ's regulations satisfied some "minimum" level of equivalence. The Attorney General was free to interpret the regulations in a manner that was more strict than contemplated by the Access Board. Therefore, the Access Board's commentary should not be imputed to the DOJ.

Once we admit that the line-of-sight regulations are ambiguous, that the DOJ did not bind itself to the Access Board's interpretation of the guidelines, and that the Attorney General was free to interpret the regulations in a manner that was more strict than the Access Board's guidelines, we have no difficulty in concluding that the Attorney General could resolve any ambiguity in the DOJ's regulations by taking a stricter view of § 4.33.3 than the Access Board did when it adopted its guidelines. The DOJ did not have to wait for the Access Board to act.

Indeed, the DOJ demonstrated its independence at a very early stage. The DOJ's regulations became effective in January 1993, and it issued its first TAM that year, as required by

42 U.S.C. § 12206(c)(3). The first TAM did not address the standing spectator problem. The following year, in 1994, the DOJ published a supplement to the TAM and offered its first formal interpretation of the line-of-sight rule in § 4.33.3: "in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand." TAM § III 7.5180 (1994 Supp.). The guidance in the TAM itself is plain; its relationship to § 4.33.3, obvious.

## C. *The TAM as the DOJ's Modification of Its Own Interpretive Rules*

Even if we were persuaded that the DOJ initially adopted the Access Board's interpretation that § 4.33.3 simply did not address the problem of standing spectators, the DOJ may change its mind. "The [Attorney General] is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation . . . . [W]here the agency's interpretation of [its regulation] is at least as plausible as competing ones, there is little, if any reason not to defer to its construction." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993). The only question is whether, in order to effectuate the change, the DOJ had to proceed through notice and comment.

**[12]** We think that, even if the DOJ's interpretation constituted a change in the understanding of its original regulations, the DOJ was not required to proceed by notice and comment because both the Access Board's original position (as imputed to the DOJ) and the TAM would constitute interpretive rules. *See* 5 U.S.C. § 553(b)(3)(A); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (holding that an agency can modify an interpretive rule without notice and comment). An interpretive rule is one "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (quotation marks and citation omitted).

"[I]nterpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule," whereas legislative rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003).

**[13]** In one sense, the 1994 Supplement to the TAM imposed obligations that might not have been anticipated. We understand how, from the perspective of facility owners such as Speedway, the 1994 Supplement appears to be a legislative rule. On the other hand, the 1994 Supplement added nothing to the existing rule except a definition of an ambiguous term; it merely clarified the DOJ's view of the scope of § 4.33.3. That is the purpose of an interpretive rule. A rule does not become a legislative rule because it effects some unanticipated change; otherwise, only superfluous rules could qualify as interpretive rules. *See Erringer*, 371 F.3d at 632 (rejecting the argument that notice and comment must apply "where one unpublished policy is replaced by a revised version of that policy that significantly affects members of the public.") We do not think that interpretive rules must be so useless. In sum, we conclude that the 1994 Supplement to the TAM was an interpretive rule and, even if it reflected a change in the DOJ's thinking about comparable lines of sight, it was a reasonable interpretation of an ambiguous regulation that did not require notice and comment prior to publication.

### III.

The regulatory scheme at issue in this case is complex, but our conclusion is simple: the DOJ's interpretation of its own regulation is reasonable and therefore entitled to substantial deference. The judgment is REVERSED.